UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X

IMPAX MEDIA INC.,                                    17 Civ. 8272

                        Plaintiff,                   OPINION

        -against-

NORTHEAST ADVERTISING CORP. D/B/A ADCORP
MEDIA GROUP, ADCORP360 INC. AND PETER
BROCCOLE,

                        Defendants.
-----------------------------------------X



USDC SDNY

1/10/18

A P P E A R A N C E S:

        Attorneys for Plaintiff

        TRACHTENBERG RODES & FRIEDBERG LLP
        545 Fifth Avenue, Suite 640
        New York, NY 10017
        By:  David G. Trachtenberg, Esq.
             Stephen Arena, Esq.

        Attorney for Defendants

        ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO,
        FERRARA, WOLF & CARONE, LLP
        1 MetroTech Center, Suite 1701
        Brooklyn, NY 11201
        By:  Justin T. Kelton, Esq.

**Sweet, D.J.**

Plaintiff Impax Media Inc. ("Impax" or the "Plaintiff") has moved by order to show cause for a preliminary injunction to prohibit Defendants Northeast Advertising Corp. d/b/a AdCorp Media Group ("AdCorp"), AdCorp360 Inc., and Peter Broccole ("Broccole" and, collectively, the "Defendants") from competing with Impax by installing or contracting to install new digital signage platforms at supermarket checkout counters during the term of the Impax-AdCorp Commission Sales Agreement in the territory of the northeastern United States and Washington D.C.

For the reasons set forth below, Plaintiff's motion is denied.

**Prior Proceedings**

On October 26, 2017, Plaintiff filed their Complaint against Defendants alleging breaches of contract and fiduciary duty, tortious interference with contract and prospective business advantage, false advertising, misappropriation of trade secrets, and unfair competition. See Compl. ¶¶ 107-91, Dkt. No. 1. That same day, Plaintiff moved for the instant preliminary

1

injunction. Dkt. No. 4. On December 13, 2017, the motion was heard and marked fully submitted.

**Facts**

The following facts are taken from the briefs, affidavits, and exhibits submitted by the parties for the instant motion.

Impax is a Canadian corporation that provides a digital advertising and communications platform compromised of digital video screens that advertise customer-focused context and advertising (the "Impax Digital Signage Platform"). Declaration of Shmuel Gniwisch dated October 25, 2017 ("Gniwisch Decl.") ¶¶ 2-4. Impax installs its digital signage largely in supermarkets and generates revenue through the sale of advertising spots that run in continuous loops on the display screens. Id. ¶¶ 3, 8.

Adcorp and AdCorp360 Inc. are New York corporations that pay supermarkets and other venues to permit the installation of digital and print advertising platforms. Declaration of Peter

2

Broccole dated December 1, 2017 ("Broccole Decl.") ¶¶ 7-8.[1]
Broccole is the president and Chief Executive Officer of Adcorp.
Gniwisch Decl. ¶ 11.

In mid-2015, Impax and AdCorp began discussing the
possibility of Impax engaging AdCorp to provide advertising
sales services for Impax in the northeastern part of the United
States, including Washington D.C. Gniwisch Decl. ¶ 16; id. Ex.
C. Impax was interested in working with AdCorp to acquire
introductions to retail supermarkets in the United States with
which AdCorp had relationships. Gniwisch Decl. ¶¶ 17-19.

One such supermarket retailer was Wakefern Food Corporation
("Wakefern"), the largest owned grocery store cooperative in the
United States. Gniwisch Decl. ¶ 19. Around August 2015, AdCorp
informed Impax that AdCorp would prepare and deliver a
presentation to Wakefern to market the Impax Digital Signage
Platform. Gniwisch Decl. ¶ 23; see id. Ex. E. While Impax and

---

[1]  The parties dispute whether AdCorp developed its own
digital screen business before or after AdCorp first began these
negotiations with Impax. Adcorp states its business began in
early 2014; Impax states that AdCorp's business did not begin
until sometime after early 2015 and based on AdCorp's knowledge
of Impax's technology. See Gniwisch Decl. ¶¶ 13, 32; Broccole
Decl. ¶ 9; Reply Declaration of Dominick Porco dated December
12, 2017 ("Porco Reply Decl.") ¶ 3. Resolution of this fact is
unnecessary to resolve the instant motion.

ACorp negotiated the terms of their written agreement, negotiations between AdCorp and Wakefern also continued. Around mid-2016, however, Wakefern terminated its discussions with Impax. Declaration of Dominick Porco dated October 25, 2017 ("Porco Decl.") ¶¶ 3-4, 8. In August 2016, Impax learned that Wakefern had entered into an agreement to have AdCorp install AdCorp's own digital signage. Porco Decl. ¶ 4. Upon inquiry, AdCorp represented to Impax that AdCorp only sold its own signage to Wakefern because Wakefern was not interested in contracting for Impax's signage technology, which used facial recognition software, termed "Tru-Reach" technology.[2] Porco Decl. ¶ 6, Broccole Decl. ¶¶ 35-40. When confronted about the Wakefern contract, Broccole informed Impax that AdCorp would limit their digital media screen sales going forward, focus on print advertising, and would continue to serve as Impax's exclusive agent for the sale of local advertising. Porco Decl. ¶ 7.

On August 15, 2016, Impax executed the Commission Sales Agreement (the "Agreement"), which was executed by AdCorp on

---

[2]     AdCorp states that, based on conversations with potential customers, customers also did not like Impax's proposed business arrangements with retailers, which required that supermarkets pay Impax license fees for Impax's digital screens, or the design of Impax's "lane gate" design, where the installed digital screens would lowered to block traffic on certain checkout counters. See Broccole Decl. ¶¶ 42-49.

4

September 8, 2016. See Gniwisch Decl. Ex. G. The Agreement included the following provisions:

- "The Company [Impax] grants the Agent [AdCorp] an exclusive right to sell Advertising [as defined by Schedule A] to local advertisers on behald of [Impax] within the territory described in Schedule B ["all of the northeast" and "Washington, DC"] for a period of 3 years commencing August 15, 2016 the [*sic*] (the 'Selling Rights')." Id., at 1.

  o Schedule A (Advertising) is defined as: "[AdCorp] is hereby allowed to sell up to four 15-second spots of advertising of the 4-minute advertising loop (either full motion video or static images)." Id., at 5.

- "[AdCorp] may not sell or attempt to sell Advertising outside the territory described in Schedule B without the express consent of [Impax]." Id., at 1.

- "[AdCorp] shall use his best efforts to sell Advertising for the duration of the Selling Rights. At the request from time to time of [Impax], [AdCorp] shall furnish [Impax] with a reasonably detailed written report on his efforts to sell Advertising in the period specified by [Impax]." Id.

- "[AdCorp] shall clearly identify himself as a duly authorized sales agent of [Impax] in the course of his efforts to sell Advertising on behalf of [Impax]." Id., at 2.

- "[Impax] shall pay [AdCorp] a commission of 60% of the revenue earned from the Advertising sold by [AdCorp] in supermarkets signed by [AdCorp] and 50% commission of the revenue earned from the Advertising sold by [AdCorp] in supermarkets signed by [Impax]." Id.

- "[AdCorp] acknowledges that by reason of its relationship to [Impax] hereunder it will have access to certain information and materials concerning [Impax's] business plans, ideas, customers and products that is confidential and of substantial value to [Impax], which value would be impaired with such information were disclosed to third parties. [AdCorp] agrees that it shall not use in any way for its own account or the account of any third party, nor

5

disclose to any third party, any such confidential
information revealed to it by [Impax]." Id.

• "[AdCorp] shall promptly advise [Impax] of any changes tin
the Agent status, organization, personnel, and similar
matters, any changes in the key personnel, organization,
and status of any major customers of [Impax] in the
Territory and any political, financial, legislative,
industrial or other events in the Territory that could
affect the mutual business interest of [AdCorp] and [Impax]
in the Territory that culd affect the mutual business
interests of [Adcorp] and [Impax], whether harmful or
beneficial." Id., at 4.

Prior to execution, certain parts of the Agreement were amended

by handwriting. For example, the phrase that Adcorp "may not

sell Advertising under his own or any other name" was removed,

Schedule A was changed from stating that AdCorp was "mandated"

to sell 15-second advertising spots to "allowed" to sell them,

and the description of Adcorp as an independent contractor was

changed to "independent sales organization." Id., at 2, 5; see

Broccole Decl. ¶¶ 13, 18.


In early May 2017, AdCorp was informed by Impax that one of

Impax's employees had sold local digital advertising to a

Foodtown on 166th Street in New York based on AdCorp's reticence

to sell advertising in that area. See Broccole Decl. ¶ 51; Porco

Reply Decl. ¶¶ 6-11; id. Ex. B. As a consequence of this

incident, an addendum to the Agreement, which, among other

things, extended the Agreement's lifespan until May 14, 2020,

6

and permitted Impax to sell local advertising, was executed by
the parties on May 15, 2017. Gniwisch Decl. ¶ 27; id. Ex. H, at
1.

Beginning around early 2017, Impax sought to develop a
business relationship with Foodtown, Inc. ("Foodtown"), the
second largest supermarket cooperative in the New York area.
Porco Decl. ¶¶ 15, 17. Allegiance Retail Services LLC
("Allegiance") is the corporate advertising arm of Foodtown.
Foodtown initially expressed interest in having Impax install
its digital signage in some of Foodtown's supermarkets. Porco
Decl. ¶¶ 18-27. In August 2017, however, following a
conversation Impax had with Broccole updating about the status
of the Foodtown deal, Allegiance informed Impax that Foodtown
had decided to install AdCorp digital screens at its checkout
counters. Porco Decl. ¶¶ 28-33; Broccole Decl. ¶ 48.

**Applicable Standard**

The general purpose of a preliminary injunction is to avoid
irreparable injury to the movant and to preserve the court's
power to render a meaningful decision after a trial on the
merits. See WarnerVision Entm't Inc. v. Empire of Carolina,

Inc., 101 F.3d 259, 261 (2d Cir. 1996). A preliminary injunction is an "extraordinary remedy" that is never awarded "as of right." Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); see also Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 65 (2d Cir. 2007). Whether injunctive relief should issue or not "rests in the sound discretion of the district court which, absent abuse of discretion, will not be disturbed on appeal." Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (citation omitted).

A party seeking a preliminary injunction must establish: (1) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; (2) irreparable harm; and (3) that issuance of the injunction would be in the public interest. See Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotations and citations omitted); Red Earth LLC v. United States, 657 F.3d 138, 143 (2d Cir. 2011). Where, as here, "the relevant facts either are not in dispute . . . or when the disputed facts are amenable to complete resolution on a paper record," a hearing is not required to resolve a motion for preliminary injunction.

8

Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998)
(citations omitted).

Pursuant to Federal Rule of Civil Procedure 52(a), in
granting or refusing a preliminary injunction, the court shall
set forth "the findings of fact and conclusions of law" which
constitute the grounds of its action. The Second Circuit has
stated that "[t]hese findings are not conclusive, and may be
altered after a trial on the merits." Visual Scis., Inc. v.
Integrated Commc'ns Inc., 660 F.2d 56, 58 (2d Cir. 1981) (citing
Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d
Cir. 1953)).

## **Plaintiff's Motion for a Preliminary Injunction is Denied**

Defendants argue that Plaintiff has not established
irreparable harm because the alleged harm is neither actual nor
imminent and is self-inflicted. Defs.' Opp. at 9-14. In
addition, Defendants contend that Plaintiff cannot succeed on
the merits of its claim because the terms of the Agreement have
not been breached and that the equities lean against granting
the preliminary injunction. Defs.' Opp. at 15-22. Plaintiff
responds that there is irreparable harm from the potential loss

9

of clients and Defendants' misappropriation of Plaintiff's confidential information, that Plaintiff is likely to succeed on its merits because Defendant breached its duty of loyalty as Plaintiff's exclusive agent, and that the balance of equities favor Plaintiff. Pl.'s Mem. at 7-13. As Plaintiff has failed to demonstrate irreparable harm, however, only that prong need be addressed. See Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999) ("If the movant fails to make a showing of irreparable harm, the motion for a preliminary injunction should be denied.").

## Plaintiff Has Not Demonstrated Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999) (internal quotation marks omitted)); see also Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999) ("The basic requirements to obtain injunctive relief have always been a showing of irreparable injury and the inadequacy of legal remedies.") "Where there is an adequate remedy at law, such as an award of money damages, injunctions

10

are unavailable except in extraordinary circumstances." Id.
(quoting Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 510
(2d Cir. 2005)). "[I]rreparable harm must be shown to be actual
and imminent, not remote or speculative." Kamerling v.
Massanari, 295 F.3d 206, 214 (2d Cir. 2002) (collecting cases).
As such, "[t]he movant is required to establish not a mere
possibility of irreparable harm, but that it is 'likely to
suffer irreparable harm if equitable relief is denied.'" Johnson
Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d
525, 531 (S.D.N.Y. 2004) (emphasis in original) (quoting JSG
Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir.
1990)). "Likelihood sets, of course, a higher standard than
'possibility.'" Id. at 532 (citation omitted).

Plaintiff argues that irreparable harm is present here
because, absent a preliminary injunction, Plaintiff "faces the
very real possibility of losing the benefit of two years of hard
work developing its product and its market opportunity and being
driven out of this market altogether." Pl.'s Mem. at 9.
Specifically, Plaintiff contends that "[d]uring the past two (2)
years . . . Impax has engaged in critical and expensive market
research and analysis to identify strategic gaps and
opportunities in the U.S. market for digital signage and

11

advertising at supermarkets." Gniwisch Decl. ¶¶ 5, 7. Plaintiff
points to Defendants' alleged misappropriation and use of this
"confidential and proprietary information" as irreparable harm,
Porco Decl. ¶ 38; see id. ¶ 40, and has stated, both in briefing
and at oral argument, that without an injunction Plaintiff will
"los[e] the opportunity to effectively market the Impact Digital
Signage Platform" and lose out on incalculable future profits.
Porco Decl. ¶ 41.

Plaintiff's alleged harm has not been established as
irreparable. The injunction Plaintiff seeks would prevent
Defendants from competing with Plaintiff's digital signage
platform going forward, pursuant to Plaintiff's interpretation
of the Agreement that a duty of loyalty prohibits Defendants
from competing for digital signage customers. However, other
than to state conclusorily that, without an injunction,
Defendants will continue to interfere with Plaintiff's
"relationships with an unknown number of customers and
prospective customers" and "is currently attempting to lure
other Foodtown member companies away," Porco Decl. ¶¶ 36, 41,
Plaintiff has not put forward evidence of potential clients with
whom Plaintiff is currently contracted, in talks with, or even
planning to negotiate, and the sum of whose potential business

revenue is incalculable to necessitate injunctive relief. The claim of acquiring customers is even more speculative because of Plaintiff's own admission that its digital platform program is in its "infancy." Porco Decl. ¶ 40. This is not enough. See Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 444-45 (2d Cir. 1977) (affirming grant of preliminary injunction when "ample evidence" has been presented to show loss of current and future business opportunities due to defendant manufacturer's termination of plaintiff distributor when product comprised eighty percent of sales); TGG Ultimate Holdings, Inc. v. Hollett, No. 16 Civ. 6289 (VM), 2016 WL 8794465, at *5 (S.D.N.Y. Aug. 29, 2016) (denying preliminary injunction when plaintiff had "not offered anything more than bare allegations that Defendants are actively soliciting their clients in a manner that would cause an imminent loss of customer relationships").

Plaintiff also states that it has spent time and resources researching the digital signage market in the United States, and that without an injunction, its failure to acquire customers in combination with this research expense will require Plaintiff to "drop out of the Territory altogether." Porco Decl. ¶ 40; see Grand Light & Supply Co. v. Honeywell, Inc., 80 F.R.D. 699, 702 (D. Conn. 1978) (denying preliminary injunction when plaintiff's

13

"only evidence of customer loss consists of predictions from its own officers"). However, "[i]nstead of presenting concrete data . . . plaintiff offers only the self-serving statement . . . that its business will collapse" without an injunction.[3] Auto Sunroof of Larchmont, Inc. v. Am. Sunroof Corp., 639 F. Supp. 1492, 1494 (S.D.N.Y. 1986). "With nothing more than this statement, plaintiff's claim is speculative." Id.

Plaintiff's conclusory claims that it will lose untold customers and future profit distinguishes the present situation from the authorities cited by Plaintiff, where the risk of lost customers was established because the plaintiff's risk of lost customers were based on customers that were already plaintiff's. For example, in BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 712 N.E.2d 1220 (1999), the court was unable to determine plaintiff's lost profits from former clients lured away by a defendant in violation of an employment contract "reimbursement clause" because the court could not determine "with any degree

---

[3]     To the extent that Plaintiff is arguing that the existence of the Agreement continues to create business-impeding strictures on Plaintiff, it is uncontested that Defendants are willing to terminate the Agreement, which, "as a practical matter," would resolve that problem. Sun Chem. Corp. v. Dainippon Ink & Chemicals, Inc., 635 F. Supp. 1417, 1423 (S.D.N.Y. 1986) (rejecting claim of irreparable harm when alleged harm was "speculative, and avoidable"); see Defs.' Opp. at 10.

14

of certainty how long a given client would have remained" with
the plaintiff absent the improper solicitation. Id. at 396. In
Register.com, Inc. v. Verio, Inc., 126 F. Supp. 2d 238 (S.D.N.Y.
2000), aff'd as modified, 356 F.3d 393 (2d Cir. 2004), the court
found incalculable harm caused to a plaintiff from a defendant's
alleged breach of contract after soliciting plaintiff's
customers because the plaintiff "lost opportunities to sell
competing services to [the plaintiff's] opt-in customers," who
had chosen to opt-in to additional sales and marketing
advertising, in addition to harm to the plaintiff's "reputation
and good will with customers and co-brand partners" that
plaintiff already had. Id. at 241, 248. In Ticor Title Ins. Co.,
the Second Circuit found incalculable the potential harm from a
long-time, successful title salesman leaving plaintiff and then
soliciting plaintiff's customers in violation of a previously
signed non-compete provision. 173 F.3d at 66-67, 69 ("[I]t would
be very difficult to calculate monetary damages that would
successfully redress the loss of a relationship with a client
that would produce an indeterminate amount of business in years
to come.").[4]

---

[4]     Other cases cited by Plaintiff also justify this
distinction. See also Johnson Controls, Inc. v. A.P.T. Critical
Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (emphasis
added) (observing that the "resulting loss of client
relationships and customer good will built up over the years

By contrast, as described above, here Plaintiff has not

established that any customers it claims it stands to lose are

actually customers, are likely to be customers, or are entities

with which Plaintiff possesses indeterminate amount of business

or good will at risk of imminent loss. See CRP/Extell Parcel I,

L.P. v. Cuomo, 394 F. App'x 779, 782 (2d Cir. 2010) (emphasis in

original) (stating that "[i]n order to show a likelihood of

irreparable harm, the plaintiff must provide some substantiation

for its claims—the harm must be imminent before a court may

issue injunctive relief" and affirming denial of injunction

because plaintiff "failed to establish that the harm at issue .

. . is anything more than a possibility).

Similarly, Plaintiff's allegation that Defendants

misappropriated Plaintiff's trade secrets and other proprietary

information does not warrant a preliminary injunction. The

constitutes irreparable harm"); Merrill Lynch, Pierce, Fenner &
Smith, Inc. v. Rahn, 73 F. Supp. 2d 425, 428 (S.D.N.Y. 1999)
(emphasis added) (finding irreparable harm when defendants
"solicited (at least some) of the clients that they serviced
while employed" by plaintiff, which was alleged to be the
"lifeblood" of plaintiff's business); Velo-Bind, Inc. v. Scheck,
485 F. Supp. 102, 109 (S.D.N.Y. 1979) (emphasis added) ("By
siphoning off plaintiff's carefully gleaned customers,
defendants subject plaintiff to a definite possibility of
irreparable harm . . . [w]hat is at stake here is plaintiff's
good will built up over the years.").

16

Second Circuit has drawn a distinction "between an individual who uses a trade secret and an individual who disseminates a trade secret" in raising a presumption of irreparable harm. Sasqua Grp., Inc. v. Courtney, No. 10 Civ. 528 (ADS) (AKT), 2010 WL 3613855, at \*12 (E.D.N.Y. Aug. 2, 2010), report and recommendation adopted, No. 10 Civ. 528 (ADS) (ETB), 2010 WL 3702468 (E.D.N.Y. Sept. 7, 2010). "Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury." Faiveley, 559 F.3d at 118-19. Plaintiff contends that Defendants used Plaintiff's proprietary information to steal customers, but there has been no evidence put forward to establish that Defendants intend to disseminate or irreparably impair that information's value. As such, the purported misappropriated information cannot support the claim that Plaintiff's injury "is actual and imminent." TGG Ultimate Holdings, Inc., 2016 WL 8794465, at \*4 (collecting cases); see also Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955, 966 (S.D.N.Y. 1996) (denying preliminary injunction and rejecting irreparable harm because "plaintiff contends only that it will suffer injury from defendants' use of the alleged trade secrets to lure customers

away" and that, "under these circumstances, the only possible injury that plaintiff may suffer is loss of sales to a competing product").

In sum, Plaintiff's claims—the alleged breach of contract, tortious interference, misappropriation of trade secrets, and unfair competition, all which allegedly resulted in loss of customers like Wakefern and Foodtown and a loss of valuable time and energy while trying to break into the United States market—are not ones where imminent and irreparable harm warrants an injunction. It is the kind of harm regularly compensated by monetary damages. See Stewart v. United States I.N.S., 762 F.2d 193, 199 (2d Cir. 1985) (internal quotation marks and citation omitted) ("Mere injuries, however substantial, in terms of money, time and energy . . . are not enough to justify injunctive relief."); Liberty Power Corp., LLC v. Katz, No. 10 Civ. 1938 (NGG) (CLP), 2011 WL 256216, at *7 (E.D.N.Y. Jan. 26, 2011) (finding harm not irreparable when plaintiff alleged that defendant's misappropriation would result in lost contracts with a "finite-albeit large-number of customers"); In re Faiveley Transp. Malmo AB, No. 08 Civ. 3330 (JSR), 2009 WL 3270854, at *5 (S.D.N.Y. Oct. 7, 2009) (rejecting claim of imminent and incalculable harm when plaintiff put forward only "the

declaration of one of its own employees" and concluding that plaintiff has not shown "risk of losing more than certain specific contracts, a loss which can be compensated by money damages"). As Plaintiff cannot show irreparable harm, it accordingly cannot be entitled to preliminary injunctive relief. See, e.g., LG Capital Funding, LLC v. Vape Holdings, Inc., No. 16 Civ. 2217 (CBA) (LB), 2016 WL 3129185, at *4 (E.D.N.Y. June 2, 2016) (denying preliminary injunction for failure to establish irreparable harm).

**Conclusion**

For the foregoing reasons, Plaintiffs' motion for a
preliminary injunction is denied.

It is so ordered.

**New York, NY**
**January    , 2018**

                              _____
                              **ROBERT W. SWEET**
                              **U.S.D.J.**

20

**Conclusion**

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is denied.

It is so ordered.

**New York, NY**
**January /0, 2018**

ROBERT W. SWEET
U.S.D.J.

20