UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

IMPAX MEDIA, INC.,

                Plaintiff,            <u>17 Civ. 8272</u>

    -against-                 <u>OPINION</u>

NORTHEAST ADVERTISING CORP. d/b/a
ADCORP MEDIA GROUP, ADCORP360 INC.
and PETER BROCCOLE,

                Defendants.

------------------------------------X

A P P E A R A N C E S:

       <u>Attorneys for Plaintiff</u>

       TRACHTENBERG, RODES and FRIEDBERG
       545 5TH Avenue
       New York, NY 10017
       By:  David G. Trachtenberg, Esq.
            Stephen J. Arena, Esq.

       <u>Attorneys for Defendants</u>

       ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN,
        FORMATO, FERRARA, WOLF & CARONE, LLP
       1 MetroTech Center, Suite 1701
       Brooklyn, NY 11201
       By:  Justin T. Kelton, Esq.

**Sweet, D.J.**

Defendants Northeast Advertising Corp. d/b/a AdCorp
Media Group ("AdCorp"), AdCorp360, Inc. ("AdCorp360") and Peter
Broccole ("Broccole") (collectively, the "Defendants") have
moved pursuant to Fed. R. Civ. P. 8(1) and 12(b)(6) to dismiss
the complaint (the "Complaint") of plaintiff Impax Media Inc.
("Impax" or the "Plaintiff"), alleging seven causes of action
arising out of the relationship between the parties involving
digital signage displays at supermarket checkout counters. Based
on the following conclusions, the motion is denied in part and
granted in part.

## Prior Proceedings

Impax, a Canadian corporation with its principal place
of business in Montreal, Quebec, filed the Complaint on October
26, 2017 against the Defendants, two New York corporations and a
New York resident. The Complaint alleges causes of action for
breach of contract (Complaint ¶¶ 107-125), breach of fiduciary
duty (Id. ¶¶ 124-130), tortious interference with contract (Id.
¶¶ 131-141), tortious interference with prospective business
advantage (Id. ¶¶ 142-161), unfair competition - false
advertising (Lanham Act, 15 U.S.C. § 1125(a)(j)(B) (Id. ¶¶ 162-

1

171), misappropriation of trade secrets (Id. ¶¶ 172-181), and unfair competition (Id. ¶¶ 182-191), resulting in damages in excess of $6,000,000.

By Opinion of January 10, 2018 (the "January 10 Opinion"), the motion of Impax to enjoin the Defendants from competing with Impax for digital signage platforms business was denied.

The Complaint alleges the following facts, which are assumed true for purposes of the instant motion to dismiss. Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

During 2015 Impax, a developer and provider of digital advertising and communications platforms, conceived the idea of developing a digital signage platform to display customer focused communications and advertising, among other content, at supermarkets. The Impax Digital Signage Platform ("IDSP") provides a network of digital video display screens for use in retail supermarkets to be placed at or behind checkout counters. Compl. ¶ 18. Impax generates its revenue through the sale of advertising spots that run in continuous loops on the displace screens. January 10 Opinion, ECF No. 25, at 3.

2

Impax has implemented the IDSP screens in many supermarkets in Montreal and Toronto, as well as in other cities throughout Canada and during the past two (2) years sought to establish a market presence in the northeastern portion of the United States and in Washington D.C. (the "Territory"). Compl. ¶¶ 19-20.

Impax has invested approximately $6 million into the development of the IDSP which generates revenue through the sale of local and national advertising spots that run in continuous loops on display screens. Id. ¶¶ 23-24.

Impax has one patent and one patent pending on key technologies. Id. ¶¶ 23-25.

Impax was introduced to AdCorp, an advertising sales agent and provider of static print advertisement platforms to supermarkets. During early 2015 AdCorp did not have a digital media platform located at supermarket checkout counters. Id. ¶¶ 26-28).

On or about April 21, 2015, Impax met with Broccole in Montreal to discuss Impax's potential engagement of AdCorp to provide advertising sales services for Impax in the Territory,

and Broccole stated that in addition to selling advertising
space on the IDSP, he and AdCorp would introduce Impax to
various supermarkets and retail outlets to help Impax develop
the IDSP and that he had relationships with various supermarkets
and retail establishments because AdCorp supplied Static Print
Advertising to such companies. Id. ¶¶ 30-33.

In particular, Broccole touted his relationships with
ShopRite supermarkets, its corporate arm Wakefern Food Corp.
("Wakefern"), and A&P, among others. Id. ¶¶ 30-33.

The parties agreed on or before February 1, 2016 that
AdCorp would receive a commission of 60% on advertising revenue
associated with supermarkets AdCorp had brought online for Impax
and 50% on advertising revenue associated with other
supermarkets and on August 15, 2016 entered into the Commission
Sales Agreement ("CSA") providing that AdCorp would receive a
commission of "60% of the revenue earned from the Advertising
sold by the Agent in supermarkets signed by the Agent and 50%
commission of the revenue earned from the Advertising sold by
the Agent in supermarkets signed by the Company" and that AdCorp
would have "an exclusive right to sell Advertising to local
advertisers on behalf of the Company within the [Territory]."

4

Impax and AdCorp entered into an addendum, effective
May 15, 2017, which was prepared by AdCorp and states that the
agreement was "entered into by and between Agent and Company on
or about February 1, 2016" extending that agreement until at
least May 14, 2020. Id. ¶¶ 37-41.

The CSA contains a provision prohibiting AdCorp from
utilizing for its own account and/or sharing with third parties
any confidential information obtained in connection with its
duties as agent, including but not limited to business plans,
ideas, customers and products and requires that, in connection
with its sales efforts, AdCorp clearly identify itself as a
sales agent for Impax and that AdCorp promptly notify Impax if
there are any changes in the status of AdCorp or in the status
of any major customers of Impax or if there have been any events
in the Territory that could affect the business interests of
Impax, that AdCorp use its best efforts to sell advertising for
and on behalf of Impax, and that AdCorp provide Impax with a
detailed written report of its efforts to sell advertising for
and on behalf of Impax. Id. ¶¶ 42-46.

As the exclusive advertising agent for Impax,
Defendants obtained substantial knowledge of Impax's technology,
product development, market research, advertising loop

5

algorithm, client pricing arrangements, incentive structures,
revenue sharing, internal profit margins and business
development strategies and client requirements, including
specific client preferences, specifications and appetites for
digital media not available to the general public and became
aware of the status of Impax's customer relationships and the
status of the negotiation of each agreement to install the IDSP.
Defendants sought and received confidential and proprietary
information regarding the IDSP and Impax and Impax's customers
under the pretext that the knowledge would allow the Defendants
to better serve Impax. Allegedly utilizing Impax's confidential
and proprietary information, Defendants have developed their own
digital platform that Defendants have marketed and currently
market to Impax's customers and potential customers. Id. ¶¶ 49-
51.

        Wakefern Food Corp. ("Wakefern") is the largest
retailer owned grocery store cooperative in the United States
comprised of approximately 50 member companies which own and
operate retail supermarkets under the ShopRite, Price Rite and
Fresh Grocer banners. Impax worked to develop a relationship
with Wakefern and its member companies to refine product
specifications in order to sell the IDSP.

During or about late 2015, Wakefern and Impax agreed
that Wakefern would recommend to its member companies that they
implement the IDSP in their stores.

During or about early 2016, Impax and Wakefern agreed
on the terms of a detailed written agreement for the
installation of the IDSP at ShopRite supermarkets and Impax met
and conferred frequently with representatives of Wakefern and
with Broccole to work out the details of the installation of the
IDSP at ShopRite supermarkets. Unbeknownst to Impax at the time,
AdCorp was then in the process of developing its own digital
signage platform for installation at supermarket checkout
counters.[1]

During September 2016, Wakefern suddenly ended its
discussions with Impax. Shortly thereafter Impax learned that
AdCorp had developed its own digital advertising platform and
that it was being installed at ShopRite supermarkets checkout
counters. AdCorp and Broccole represented to Impax's customers,
including Wakefern that Impax's technology was deficient and

---

[1]    As was noted in the January 10 Opinion, the parties dispute
whether AdCorp developed its own digital screen business before
or after AdCorp first began negotiations with Impax. AdCorp
states its business began in early 2014, but Impax states that
AdCorp's business did not begin until sometime after early 2015.
See Gniwisch Decl. ¶¶ 13, 32; Broccole Decl. ¶ 9; Reply
Declaration of Dominick Porco ¶ 3.

that Impax was an unstable company without the ability to honor its commitments to its customers. Id. ¶¶ 52-60.

On or about June 14, 2016 Broccole and AdCorp is alleged to have formed an entity named AdCorp360 Inc. to market and sell its version of the IDSP to Wakefern and to directly compete against Impax. In an effort to conceal Defendants' wrongful conduct, Broccole fabricated several purported reasons why Wakefern and certain of its member companies chose not to contract with Impax.

Defendants claimed that a purported technology issue led Wakefern to abandon Impax, although the purported technology issue had already been resolved and Defendants pretended to continue to assist Impax in closing a deal they knew would not happen. Id. ¶¶ 61-65.

Foodtown, Inc. is a large retail supermarket cooperative, the second largest supermarket cooperative in the New York area after Wakefern. Id. ¶¶ 67-68.

Allegiance Retail Services LLC ("Allegiance") is the corporate advertising and communications arm of Foodtown, Inc.

8

(Foodtown, Inc. and Allegiance are hereinafter referenced together as "Foodtown"). Id.

Beginning during or about early 2017, Impax made extensive efforts to develop a relationship with Foodtown in order to sell the IDSP to Foodtown and its member companies and Impax reached agreements with Foodtown and several of Foodtown's member companies. Id. ¶¶ 70-71.

Foodtown prepared proposals for the IDSP to be sent to its member companies and recommended its use. Id. ¶ 72.

During or about July 2017, Foodtown agreed to facilitate the implementation of the IDSP in several of its member company supermarkets. During or about August 2017, Impax, Foodtown and several Foodtown member companies began exchanging signature pages in connection with the implementation of the IDSP. Id. ¶¶ 73-74.

On or about August 9, 2017, Broccole contacted Impax and inquired about the status of the Impax/Foodtown agreements. He told Impax that he was inquiring because he wanted to know if AdCorp could begin selling advertising for the IDSPs to be implemented in the Foodtown stores. Id. ¶¶ 75-76.

9

Impax informed Broccole that agreements had been
struck and that Impax would have the signatures within 48 hours.
Approximately 48 hours after Broccole's inquiry, Foodtown
notified Impax that Foodtown had decided to go in a different
direction and Impax later learned that Foodtown had decided to
enter into agreements with Adsorb. Id. ¶¶ 77-79.

The Complaint alleges that once Defendants became
aware that eight Foodtown supermarkets were about to execute
agreements with Impax, Defendants intentionally and maliciously
communicated false and disparaging statements concerning Impax
and its products and services to Foodtown and its member
companies. Id. ¶ 80.

Broccole and AdCorp utilized AdCorp360 Inc. to provide
its version of the IDSP to Foodtown and to directly compete
against Impax and fabricated reasons as to why Foodtown and
certain of its member companies purportedly chose to contract
with Defendants rather than with Impax and claimed that they
would aggressively sell more advertising on the IDSP that are
already in place with other supermarkets. Id. ¶¶ 67-84.

AdCorp allegedly failed to properly perform its duties pursuant to the CSA, its work as advertising sales agent has been sporadic, it has not sold any advertising for or on behalf of Impax over long periods of time, and it has sold advertising for its own competing digital advertising platform. Id. ¶¶ 85-89.

AdCorp failed to provide Impax with a detailed written report of its efforts to sell advertising for and on behalf of Impax and Impax has lost significant advertising revenue and business relationships as a consequence. Id. ¶ 90.

As a result of Defendants' wrongful conduct, Impax's relationships with several customers and prospective customers have been and continue to be damaged. Defendants have significantly harmed Impax's goodwill and market prestige. Id. ¶¶ 85-95.

Broccole is alleged to be the sole owner of both AdCorp and AdCorp360, which were utilized as his alter egos. Broccole, AdCorp, and AdCorp360 commingled funds and/or ignored corporate formalities with respect to each other. Id. ¶¶ 99-101,

AdCorp and AdCorp360 utilize the same offices, personnel and materials to perpetrate the wrongful conduct described in the Complaint Id. ¶¶ 99-105.

The Defendants' motion to dismiss the Complaint was heard and marked fully submitted on March 28, 2018.

**The Applicable Standard**

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (emphasis added). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (internal quotation marks omitted).

While "a plaintiff may plead facts alleged upon
information and belief 'where the belief is based on factual
information that makes the inference of culpability plausible,'
such allegations must be 'accompanied by a statement of the
facts upon which the belief is founded.'" Munoz-Nagel v. Guess,
Inc., No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3 (S.D.N.Y.
Apr. 30, 2013) (quoting Arista Records, LLC v. Doe 3, 604 F.3d
110, 120 (2d Cir. 2010)); Prince v. Madison Square Garden, 427
F. Supp. 2d 372, 384 (S.D.N.Y. 2006); Williams v. Calderoni, 11
Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)).
The pleadings, however, "must contain something more than . . .
a statement of facts that merely creates a suspicion [of] a
legally cognizable right of action." Twombly, 550 U.S. at 555
(citation and internal quotation omitted).

**The Complaint Has Adequately Alleged a Breach of Contract**

In order to state a claim for breach of contract, a
plaintiff must allege "an agreement, performance by the
plaintiff, breach by the defendant, and damages suffered by
plaintiff." Startech, Inc. v VSA Arts, 126 F. Supp. 2d 234, 236
(S.D.N.Y. 2000).

Impax's breach of contract claim alleges that AdCorp
has breached its contractual obligations under the CSA by, among
other things, (1) misappropriating confidential information; (2)
failing to promptly notify Impax of changes in the status of
AdCorp or in the status of any major customers of Impax; (3)
failing to use its best efforts; (4) failing to provide Impax
with a detailed written report of its efforts; and (5) failing
to identify itself as an agent for Impax. Complaint ¶¶ 114-118.
Those claims expressly relate to specific provisions of the CSA.
See id. ¶¶ 38-48; Porco Declaration ¶¶ 9-14; Gniwisch Injunction
Decl. ¶ 23.


Defendants contend that the alleged breaches of the
confidentiality provision of the CSA are not actionable because
Plaintiff has failed to identify any confidential information
and has failed to allege that Defendants used such confidential
information. See Defs' Br., p. 7-8. However the Complaint
contains the following allegation:

- "The [CSA] contains an express confidentiality
provision prohibiting AdCorp from utilizing for
its own account and/or sharing with third parties
any confidential information obtained in
connection with its duties as agent, including

14

but not limited to business plans, ideas,
customers and products." Complaint, ¶ 42;

- "AdCorp has utilized and continues to utilize
  Impax's designs, business plans, strategies and
  customer information to solicit customers of
  Impax and to offer a knockoff digital signage
  product for sale to these customers." Complaint,
  ¶ 7;

- "As the exclusive advertising agent for Impax,
  Defendants obtained substantial knowledge of
  Impax's technology, product development, market
  research...customer relationships and the status
  of the negotiation of each agreement to install
  the IDSP . . ." Complaint ¶ 49;

- "Utilizing Impax's confidential and proprietary
  information . . . Defendants have developed a
  knockoff digital platform that Defendants have
  marketed and currently market to Impax's
  customers and potential customers." Complaint, ¶
  51; and

- "Defendants' solicitation and servicing of the
  Supermarkets was done utilizing unfair or
  improper means, such as through the unlawful use

15

of Impax's confidential, proprietary, and trade

secret information...." Complaint, ¶ 149.

Knowledge of negotiations with customers is considered

valuable confidential information. Ticor Title Ins. Co. v.

Cohen, 1998 WL 355420, at *4 (S.D.N.Y. 1998) (finding that

"knowledge of pending transactions, [constituted confidential

information and] would clearly give him and TitleServ an unfair

advantage in wresting these deals away from Ticor").

The Defendants contend that these allegations lack

sufficient factual basis, and represent an "anticompetitive"

attempt to "relieve [Impax] of the business deal it struck."

Def. Reply, ECF No. 31, p. 6-7. However, the allegations

adequately plead facts underpinning Defendants' breaches,

particularly those arising from the use of confidential

information. Compl. ¶¶ 42, 7, 49, 51. (alleging, inter alia,

that "AdCorp has utilized and continues to utilize Impax's

designs, business plans, strategies and customer information to

solicit customers of Impax[.]"); Bancorp Services, LLC v.

American General Life Insurance Co., No. 14-cv-9687, 2016 WL

4916969, at *10-11 (S.D.N.Y. Feb. 11, 2016) (denying motion to

dismiss breach of contract claim, because Non-Disclosure

Agreement, which "protect[ed] against the unauthorized use and

16

distribution of affiliates' confidential information," was breached by Defendant, who used and shared confidential product information for profit.).

Moreover, despite Defendant's contention otherwise, the Complaint adequately alleges breach of contract with regard to AdCorp's contractual obligation to "disclose to Impax if there were any changes in the status of AdCorp or in the status of any major customers of Impax." Compl. ¶¶ 42-46, 110. The Complaint alleges that AdCorp breached this contractual term when it failed to disclose to Impax, among other things, "that Impax's major customers were abandoning or considering abandoning Impax as clients in order to enter agreement with AdCorp." Compl. ¶ 116.

The first claim having been adequately pled, Defendant's motion to dismiss the breach of contract claim is denied.

**The Complaint Adequately Alleges a Breach of Fiduciary Duty**

No challenge has been presented to Impax to contend that "[t]he elements of a claim for breach of fiduciary duty are: (1) a fiduciary relationship between the parties; and (2) a

17

breach of the fiduciary duty." *Forum Ins. Co. v Zeitman*, 91 Civ. 7980(LLS), 1995 WL 546949, at *2 (S.D.N.Y. Sept. 13, 1995); *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 427 (Bankr. S.D.N.Y. 2005).The Defendants contend that the Complaint fails to establish a fiduciary duty, and that no such duty was owed. Def. Memo in Support, p. 8-9.

First, Plaintiff has adequately alleged a principal and agent relationship between Impax and AdCorp. (Complaint ¶ 125 ("As an agent or affiliate of an agent of Impax which was employed in a position of trust, Defendants owed Impax a duty of loyalty....") and a violation of duty of loyalty by, among other things, "engag[ing] in a directly competitive business venture and [] steal[ing] or attempt[ing] to steal Impax's customers." Id., ¶ 6; see also Complaint, ¶¶ 3, 5, 6, 31-39, 60-62, 65, 80-84, 92-98, 125-127.

"[A]n agent has a fiduciary duty to act loyalty for the principal's benefit in all matters connected with the agency relationship." Restatement (Third) Of Agency § 8.01 (2006). See also Phansalkar v Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003); In re Nigeria Charter Flights Contr. Litig., 520 F. Supp. 2d 447, 460 (E.D.N.Y. 2007).

In addition to the elemental allegations of a principal/ agent relationship, it is also alleged that:

- "AdCorp was and is the exclusive advertising sales agent of Impax." Complaint ¶ 4;
- "AdCorp's engagement encompassed utilizing its contacts in the supermarket industry to market and sell the IDSP to supermarkets with which it had relationships." Complaint ¶ 5;
- Broccole "and AdCorp would introduce Impax to various supermarkets and retail outlets for the purpose of helping Impax to develop the IDSP business with such establishments." Complaint ¶ 31;
- The AdCorp/Impax relationship was premised on a "working partnership between Impax and AdCorp based upon the synergy between the two companies" Complaint ¶ 34; and
- "[I]n soliciting Impax's business, Broccole represented that AdCorp would be able to quickly close deals with the aforementioned supermarket companies for the benefit of Impax." Complaint ¶ 35.

19

Nor, as Defendants suggest, is the scope of AdCorp's fiduciary duty limited to its sale of advertising. Defs' Memo in Support, ECF No. 26, p. 2, 7. An agent's fiduciary duty extends to all activities relating to the subject of its agency. Caleb & Co. v. E.I. DuPont de Nemours & Co., 599 F. Supp. 1468, 1475 (S.D.N.Y. 1984) ("An agent is a fiduciary with respect to matters within the scope of his agency.") (citing Restatement of the Law of Agency, 2d § 13.); see also Johnson v Priceline.com, Inc., 711 F.3d 271, 277 (2d Cir. 2013) ("An agent is a fiduciary with respect to matters within the scope of his agency.").

Here, it is alleged that, since the onset of their relationship, AdCorp would utilize its extensive contacts in the supermarket industry to spearhead the growth of the IDSP. Complaint ¶¶ 32-35. Pursuant to the CSA, AdCorp was to be paid more for the sale of local advertising in supermarkets which had been signed up for Impax by AdCorp. AdCorp was thus contractually incentivized to help supermarkets which had been signed up for Impax by AdCorp. More than just advertising, AdCorp was contractually incentivized to help Impax to build its network. Complaint ¶¶ 37-38.

It is the character and circumstances surrounding the relationship that determine the duty of the agent. LLC v iMesh, Inc., 06 Civ. 7660 (DC), 2009 WL 705537, at *7-8 (S.D.N.Y. Mar. 19, 2009); see also Veleron Holding, B.V. v. Morgan Stanley, 117 F.Supp.3d 404, 452 (S.D.N.Y. 2015) ("Where a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it.").

To determine whether a party in a business relationship has a fiduciary duty depends on an inquiry into the "nature and quality of that relationship" which is an issue of fact that is ill-suited for resolution on a motion to dismiss. Kidz Cloz, Inc. v Officially For Kids, Inc., No. 00 Civ. 6270 (DC), 2002 WL 392291, at *4-5 (S.D.N.Y. Mar. 13, 2002); Sokol Holdings, Inc. v BMB Munai, Inc., 726 F. Supp. 2d 291, 306 (S.D.N.Y. 2010), aff'd in part, 438 Fed. Appx. 45 (2d Cir. 2011) (A fiduciary duty "depends on the 'nature and quality of that relationship' . . . New York courts do not adhere to 'rigid formulas" in determining whether a fiduciary duty exists'"); United States v. Halloran, 664 Fed.App'x 23, 27 (2d Cir. 2016)("The existence of a fiduciary duty is a question of fact for the jury."). The issue presented is whether or not an agent with the exclusive right with respect to sales and the

requirement to use best efforts performance has a fiduciary duty
to her principal.

The Defendants contend that the breach of fiduciary
duty claim (Defs' Memo in Support, p. 6) is encompassed by its
breach of contract claim, and must therefore be dismissed. While
Defendants are correct that a breach of a fiduciary duty that
"covers the precise subject matter" of a breach of contract
cannot stand, that is not the case here. The facts underlying
the breach of fiduciary duty claim are distinct from those
alleging breach of contract.

The Complaint alleges a breach of fiduciary duty based
on AdCorp's fiduciary obligation to "exercise the utmost good
faith and loyalty in the performance of their duties for Impax."
Compl. ¶¶ 125-126. More specifically, it is alleged that AdCorp
breached that duty when it "utilized [confidential] information
to establish a knockoff digital advertising system to directly
compete with Impax." Id. at 126. To the extent the contract, as
written, permitted AdCorp to compete with Impax, such
competition, as alleged, may have nonetheless violated the
fiduciary duties of good faith and loyalty. The breach of
fiduciary duty claim includes facts sufficiently distinct from
the breach of contract claim.

Moreover, the same conduct constituting the breach of a contractual obligation may also constitute breach of a duty arising out of the relationship created by the contract but independent of the contract itself. See, e.g., Mandelblatt v Devon Stores, Inc., 132 A.D.2d 162, 167-68 (1st Dep't 1987). Contract and tort claims arising out of the same transaction or occurrence may coexist so long as the tort claims relate to non-contractual duties, including fiduciary duties. See, e.g., Andersen, Weinroth & Co., L.P. v. Weinroth, 48 A.D.3d 121, 136, 849 N.Y.S.2d 210, 222 (1st Dep't 2007); Rodin Properties-Shore Mall, N.V. v. Ullman, 264 A.D.2d 367, 368, 694 N.Y.S.2d 374, 376 (1st Dep't 1999); Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 55, 529 N.Y.S.2d 279, 281-82 (1st Dep't 1988).

Undertaking to act as a party's agent can assume a fiduciary duty independent of the specific contractual obligations of the agreement creating the relationship. The Ltd., Inc. v McCrory Corp., 169 A.D.2d 605, 607 (1st Dep't 1991) ("allegations are adequate to state that defendants undertook to act as the Lerner Group's agent in preparing and filing franchise tax returns and paying the requisite taxes and thereby assumed a fiduciary duty independent of the contractual obligations alleged."); Hollis v Charles Const. Co., Inc., 302

23

A.D.2d 700, 702 (3d Dep't 2003) ("The Jones Agency owed a
fiduciary duty to Midrox as its agent, which was independent of
its contractual relationship").

In any event, whether an agency relationship exists is
a question of fact that is generally not appropriate for
determination on a motion to dismiss. Samba Enterprises, LLC,
2009 WL 705537, at *7 ("The existence of an agency relationship
is a mixed question of law and fact that should generally be
decided by a jury."); see also La Barte v Seneca Resources
Corp., 285 A.D.2d 974, 976 (4th Dep't 2001) ("Whether a
fiduciary relationship exists between parties 'is necessarily
fact-specific....'"); Veleron, 117 F. Supp. 3d at 451.

Defendants contention that the CSA does not contain a
non-compete clause is inapposite to the issue at hand. See Defs'
Memo in Support, pp. 2, 6, 7, 9. The existence of a non-compete
clause is not required to create fiduciary duties. Non-compete
clauses typically restrict competition *after* the fiduciary
relationship has ended. See, e.g., Defs' Memo in Support, pp. 6-
7 (citing PSC, Inc. v. Reiss, 111 F.Supp.2d 252, 253 (W.D.N.Y.
2000) ("barring one of its former salesmen, defendant Martin J.
Reiss ("Reiss"), from working for a competitor"); CSA, Addendum,
Schedule C, Section 1 ("Employee agrees that, for a period of

24

six ( 6) months after the termination of her/his employment with the Company, she/he shall not...engage...in any business that competes with the business of AdCorp").

Here, the Complaint alleges that, at the time of the creation of the relationship between the parties, there was no indication that Defendants had the capacity to compete with Impax. Compl. ¶ 28 ("At the time Impax was introduced to AdCorp during early 2015, AdCorp did not have a digital media platform located at supermarket checkout counters."). Indeed, it is alleged that only by virtue of the alleged contract breach was AdCorp able to present a competing product. Id. ¶ 51. The Complaint adequately alleges both the existence of a principal/ agent relationship, and a fiduciary duty breach.

**The Complaint Has Not Adequately Alleged Tortious Contract Interference**

Impax correctly states the requirements for a cause of action for tortious interference with contract.

> To state a cause of action for tortious interference with contract, a plaintiff must allege: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) intentional interference with it; (4) breach of the contract; and (5) damages. Hoag v. Chancellor. Inc., 246 A.D.2d 224, 228 (1st Dep't

25

1998); <u>Riddell Sports Inc. v. Brooks</u>, 872 F.
Supp. 73, 77 (S.D.N.Y. 1995).

Pl. Opp., p. 14, ECF No. 26.

The Complaint alleges that Impax reached "agreements"
with both Wakfern/ ShopRite and Allegiance/ Foodtown. Complaint
¶¶ 54, 55. The Complaint further alleges that Defendants were
aware of such agreements. <u>Id.</u> ¶¶ 56, 75. A review of the
allegations of the Complaint, however, reveals a pleading
deficiency: the absence of an enforceable contract. The motion
to dismiss the tortious interference with contract claim is
therefore granted.

**The Complaint Adequately Alleges Tortious Interference with
Prospective Business Advantage**

To state a claim for interference with prospective
business advantage, a plaintiff must allege that "(1) the
plaintiff had business relations with a third party; (2) the
defendant interfered with those business relations; (3) the
defendant acted for a wrongful purpose or used dishonest,
unfair, or improper means; and (4) the defendant's acts injured
the relationship." <u>Catskill Dev., L.L.C. v. Park Place
Entertainment Corp.</u>, 547 F.3d 115, 132 (2d Cir. 2008).

Defendants unsuccessfully challenge the allegations of interference with prospective business advantage, and contend that allegations of wrongful means are deficient. In effect, the Defendants rely on their contractual right to compete. Def. Memo in Support, p. 15.

Herein lies the issue of the status of the Defendants and their concomitant duties. A breach of fiduciary duty and the use of confidential information to develop a competing platform (Complaint, ¶ 54) adequately allege wrongful means.

Impax's allegation that Defendants sought and obtained customer information under false pretenses is sufficient to establish "wrongful means." Fonar Corp. v. Magnetic Resonance Plus, Inc., 857 F. Supp. 477, 484 (S.D.N.Y. 1997) (defendant, "under false pretenses, obtained a customer list, and subsequently offered discounts to selected customers on the list. Such behavior is clearly fraudulent and constitutes interference by wrongful means."); see also Complaint, ¶ 50 ("Defendants sought and received confidential and proprietary information regarding the IDSP and Impax and Impax's customers under the pretext that the knowledge would allow the Defendants to better serve Impax.").

Because the allegations of wrongful means are
adequately alleged, see Complaint the motion to dismiss the
claim of tortious interference with business opportunity is
denied.

## The Complaint Does Not Adequately Allege Violation of the Lanham Act

Impax has alleged that the Defendants have made false
statements in commercial advertising that violate the Lanham Act
Complaint ¶ 161.

Defendants contend that "a claim of false advertising
may be based on at least one of two theories: 'that the
challenged advertisement is literally false (i.e., false on its
face') or 'that the advertisement, while not literally false, is
nevertheless likely to mislead or confuse consumers.'" Tiffany
(NJ) Inc. v. eBay, Inc., 600 F.3d 93, 112 (2d Cir. 2010)
(quoting Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144,
153 (2d Cir. 2007). However, Impax does not allege commercial
advertising, or any consumer confusion.

Impax has sought to satisfy the "commercial
advertising" requirement by stating that Defendants: (i)
"falsely represented to Impax's customers ... that Impax's

28

technology was deficient and that Impax was an unstable company without the ability to honor its commitments to its customers"; and (ii) AdCorp made "misrepresentations regarding Impax's goods and services ... and that Impax's major customers were abandoning or considering abandoning Impax...." Pl. Opp. at 21.

However, generic puffery is not actionable as false advertising. See, e.g., Nikkal Indus., Ltd. V. Salton, Inc., 735 F. Supp. 1227, 1234 n.3 (S.D.N.Y. 1990) (statement that product was "better" than its competitors' constitutes mere non-actionable "puffing"); Pizza Hut, Inc. v. Papa John's Int'l., Inc., 227 F.3d 489, 498 (5th Cir. 2000) ("[I]t appears indisputable that [defendant's] assertion 'Better Pizza' is non-actionable puffery."). Similarly, as with defamation claims, "[s]ubjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act." Groden v. Random House, Inc., 1994 WL 45555, at *5 (S.D.N.Y. Aug. 22, 2994) (citations omitted). Thus, Impax allegations do not rise to the level of actionable false advertising.

With respect to consumer confusion, Impax has alleged that "[u]pon information and belief, Defendants' false and misleading descriptions and/or statements actually deceive or have a tendency to deceive a substantial segment of customers in

29

the supermarket industry" and that "[u]pon information and
belief, Defendants' false and misleading statements and/or
descriptions are material, and are likely to influence the
purchasing decisions of actual and prospective customers."
Complaint ¶ 167.

To seek monetary relief under the Lanham Act,
Plaintiff must allege "actual damages that were causally related
to actual consumer confusion or deception of the purchasing
public." Randa Corp. v. Mulberry Thai Silk, Inc., 2000 WL
1741680, at *2 (S.D.N.Y. Nov. 27, 2000) (citations omitted).
Impax does not allege that the purchasing public has been
confused or deceived or the loss of an actual, non-speculative
sale.

Because Impax has not adequately alleged a Lanham Act
violation, Defendants' motion to dismiss that claim is granted.

**The Complaint Adequately Alleges Appropriation of Trade Secrets**

Whether information constitutes a trade secret depends
upon a variety of factors and is generally a question of fact.
Ashland Mgt. Inc. v. Janien, 82 N.Y.2d 395, 407 (1933); Am.
Bldg. Maintenance Co. of New York, 515 F. Supp.2d at 308.

Defendants contend that Plaintiff has failed to identify any actual trade secret or misappropriation thereof. Def. Reply pp. 4, 21.

However, the Complaint expressly states that Defendants misappropriated Impax's trade secrets and used the trade secrets to steal Impax's customers. Complaint, ¶¶ 175, 176. It defines "Trade Secrets" as follows:

> Impax's technology, product development, market research, advertising loop algorithm, client pricing arrangements, incentive structures, revenue sharing, internal profit margins and business development strategies and client requirements, including specific client preferences, specifications and appetites for digital media not available to the general public. Likewise, Defendants became aware of the status of Impax's customer relationships and the status of the negotiation of each agreement to install the IDSP (collectively, Impax's "Trade Secrets").

> Complaint ¶ 49.

The Complaint alleges that AdCorp was bound by the confidentiality provision of the CSA. Complaint, ¶¶ 42, 10). Thus, the trade secret information was expected to remain secret.

31

The specific client preferences and specifications of a plaintiff's customers and potential customers are sufficiently alleged to be trade secrets. See Am. Bldg. Maintenance Co. of New York, 515 F. Supp. 2d at 308. Furthermore, as set forth above, Defendants' knowledge of the status of Plaintiff's customer relationships is considered valuable confidential information. See Ticor Title Ins. Co. v. Cohen, 1998 WL 355420, at *4 (S.D.N.Y. 1998).

The motion to dismiss the appropriation of trade secret claims is denied.

**The Unfair Competition Claim is Duplicative of the Breach of Contract Claim**

Defendants seek dismissal of the unfair competition claims on the ground that it is duplicative of the breach of contract claim. Def. Memo in Opp., p. 24-25. Impax did not address this contention in its Memorandum or its Memorandum in Opposition thereby conceding it. See In re UBS AG Sec. Litig., No. 07-CV-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (arguments not addressed in opposition brief are conceded); see also In re Jumei Int'l Holding Ltd. Sec. Litig., No. 14-cv-9826, 2017 WL 95176, at n. 4 (S.D.N.Y. Jan. 10, 2017) ("Plaintiffs did not address Defendants' argument that the

Complaint fails to plead motive, and *thus concede that point*)
(emphasis added).


The motion to dismiss the unfair competition claim is
granted.


**The Complaint Adequately Alleges Alter Ego Liability
of Broccole and AdCorp360**


The Defendants appear to move to dismiss the Complaint
against Broccole and AdCorp360, on the basis that neither
defendant was a party to the CSA. Defs. Memo in Support, p. 1,
6, 9, n.4. However, the Complaint does in fact allege that
Broccole is the sole owner of AdCorp and AdCorp360, both of
which were utilized as alter egos, ignoring corporate
formalities, commingling funds, concealing the conduct alleged
with identical offices, personnel and material. Compl. ¶¶ 99-
103; see also Freeman v. Complex Computing Co., Inc. 119 F.3d
1044, 1053 (2d Cir. 1997) (alter ego liability exists where "the
corporation had no separate mind, will, or existence of its
own," and "was used to commit wrong, fraud, or the breach of a
legal duty.") (internal citations and quotations omitted). The
Defendants, however, have not challenged the alter ego
allegations. They are therefore deemed adequate.

Whether such allegations meet the requirements of alter ego liability (see CBF Industria de Gusa S/A v. AMCI Holdings, Inc. et al., 13-cv-2581, 2018 WL 3014091, at *19 (S.D.N.Y., June 15, 2018) remains to be seen. Though barebones, the unchallenged allegations of alter ego liability in the Complaint are adequate and the motion to dismiss the Complaint against Broccole and AdCorp360 is denied.

**Conclusion**

Based upon the conclusions set forth above, the Defendants' motion to dismiss the First, Second, Fourth, Sixth Claims for Relief is denied and granted as to the Third, Fifth and Seventh Claims for Relief.

Parties are directed to meet and confer on a pretrial conference, discovery, and trial.

It is so ordered.

New York, NY
August /7, 2018

_____
ROBERT W. SWEET
U.S.D.J.